**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE NO.  1:19-cv-25045

| | |
|---|---|
| Vicky Cornell, individually, and in her capacity, and as the Personal Representative of the Estate of Christopher John Cornell *a/k/a* Chris Cornell, | **JURY TRIAL DEMANDED** |

                        Plaintiffs,

     v.

Soundgarden, a purported Washington General Partnership, Kim A. Thayil, Matt D. Cameron, Hunter Benedict Shepherd, Rit Venerus and Cal Financial Group, Inc.,

                       Defendants.

_____/

## COMPLAINT

Plaintiff, Vicky Cornell, individually and in her capacity as the personal representative of the Estate of Christopher John Cornell (collectively, "Plaintiffs") through counsel, hereby files the following complaint against the defendants, Soundgarden, Kim Thayil, Matt Cameron, Hunter Benedict Shepherd, Rit Venerus and Cal Financial Group, Inc. (collectively, "Defendants").

## I.       INTRODUCTION

*"Everybody out for my blood, everybody want my percent …*
*They just want to take what is mine, how much more can they get*."

**-** *Sweet Revenge*

1.       In 2009, Chris Cornell penned these lyrics about his former Soundgarden bandmates after they unlawfully (and unsuccessfully) attempted to deprive him of his rights in connection with the valuable musical works that he created for the band.  Ten years later, and after Chris' untimely passing, these lyrics hauntingly resonate as his former bandmates, once

again, have attempted to "take what is his" – or, more aptly, to steal from his widow and minor children. This wrongful conduct shockingly started shortly after Chris' untimely death and ultimately forced his widow, Vicky Cornell, to bring this lawsuit.

2.      This case arises out of the disgraceful conduct of Chris' former Soundgarden bandmates – Kim Thayil, Matt Cameron and Ben Shepherd – who, along with their business manager, Rit Venerus, have shamelessly conspired to wrongfully withhold hundreds of thousands of dollars indisputably owed to Chris' widow and minor children in an unlawful attempt to strong-arm Chris' Estate into turning over certain audio recordings created by Chris before he passed away.

3.      The disputed seven audio recordings were solely authored by Chris; contain Chris' own vocal tracks; and were bequeathed to Chris' Estate for the benefit of his widow, Vicky Cornell, and their minor children.

4.      Vicky long ago offered to share the sound recordings with the band, provided that they were released in a way that would respect her late husband's legacy and wishes (including to have his trusted producer involved in the process). The band refused, however, on the absurd contention that the recordings are somehow the sole property of their purported partnership and that they (despite not creating the sound recordings) are somehow entitled to unilaterally dictate how the recordings should be exploited.

5.      After rejecting Vicky's offer to share Chris' recordings according to Chris' wishes, the Defendants resorted to strong-arm tactics by withholding royalties undeniably owed to Chris' estate (on which Chris' three surviving children are dependent). Worse, Chris' former band members menaced Chris' family with false media statements intended to rile the cyber-stalkers who have been making vile online accusations and the real-life stalker, who was recently released from Federal prison after threatening Vicky's life. The band has broadcast public

misinformation without regard for intensifying the hateful targeting of Chris' family, despite knowing that the family already needed FBI protection, and despite Vicky's pleas that they not make any future statements that would further endanger Chris' children.  Even after being shown examples of the online hate directed towards Chris' children, Thayil persisted. By knowingly imperiling Chris' family with such callous cruelty, the former band members have revealed their monstrous avarice for the sound recordings which they neither created nor own.

6.    Vicky is reluctantly bringing this action because, despite numerous attempts to work with the band on the release of Chris' sound recordings, the band has refused to honor Chris' legacy and wishes. Instead, they are continuing to coerce Vicky by egregiously withholding monies due to her and Chris' children (even though Rit Venerus and the band fraudulently assured Vicky that the monies would be paid to her).  The band members' tortious conduct towards Chris' family is consistent with their animus towards Chris, displayed when they failed to so much as turn around their tour bus upon learning of Chris' death; failed to check in with Chris's grieving family; and failed to so much as attempt to quell the online threats against Chris' children.

7.    Through this action, Vicky seeks to vindicate her late-husband's rights in the sound recordings that he created, to recover the substantial sums of money and personal property that are being unlawfully withheld by Venerus and the band, and to emphatically answer the lyrical question her husband raised about his former bandmates, "how much more can they get?" NOTHING.

## II.    PARTIES, JURISDICTION AND VENUE

### A.    The Parties.

8.    Plaintiff Vicky Cornell (hereinafter, "Vicky") is the widow of rock icon Christopher John Cornell (né Boyle) ("Chris"), and the Personal Representative of the Estate of

Christopher John Cornell. Vicky married Chris in 2004, is the mother of their two minor children, and the primary source of financial support for Cornell's first daughter from a prior marriage.  Vicky resides within the State of Florida and within this Court's district.

9.      Plaintiff, the Estate of Christopher John Cornell (the "Estate"), is Chris' estate. Chris was an internationally-renowned musician, singer and songwriter, best known as the lead vocalist for the rock bands Soundgarden and Audioslave, with an octave-scaling voice and a signature vocal belting technique. Chris' last will and testament bequeathed his property, including his intellectual property rights, to Vicky for the benefit of her and their children.

10.     Defendant Soundgarden purports to be a Washington General Partnership, with its principal place of business in the State of Washington ("Partnership").  Soundgarden is also the name of the band (the "Band") formed in Seattle, Washington in 1984.  The Partnership claims to be the owner of many of the Band's intellectual property rights, as well as many of its musical works.  The Partnership, either directly or through authorized agents, sells, markets, promotes, streams, licenses, distributes and otherwise exploits the Band's musical works through a variety of different media worldwide and throughout the United States, the State of Florida, and in Miami-Dade County.  The Partnership is also the owner, operator and/or licensor of the Band's website, which offers official Soundgarden merchandise for sale to citizens of the State of Florida. (*See* http://www.soundgardenworld.com/).

11.     Defendant Kim Thayil ("Thayil") is an original Band member.  Thayil was the lead guitarist and played in the Band from 1984 until the Band dissolved in 1997, and then again when the Band reformed in 2010 to the present date. Thayil is a purported partner in the Partnership.

12.     Matt Cameron ("Cameron") became the Band's full-time drummer in 1986, and played with the Band through the balance of its first stint, and then again from 2010 to the

present date.  Cameron is a purported partner in the Partnership.

13.     Ben Shepherd ("Shepherd") formally joined the Band in 1990 as a bassist, replacing original Band member, Hiro Yamamoto.  Shepherd was a Band member from 1990 through 1997, and has been with the Band continuously since it regrouped in 2010.  Shepherd is a purported partner in the Partnership.

14.     Rit Venerus ("Venerus") has at all relevant times served as the Band's business manager.  After Chris' passing, and prior to conspiring with the Partnership to unlawfully withhold monies owed to Plaintiffs, Venerus also rendered services to Plaintiffs by purporting to collect, oversee, and safeguard Chris' record and publishing royalties for Plaintiffs' benefit.

15.     Cal Financial Group ("Cal Financial") is Venerus' financial management firm, and purports to provide "comprehensive financial management for clients in the fields of entertainment and sports as well as high net worth individuals." (*See* https://www.calfinancialgroup.com/).

**B.     Jurisdiction and Venue**.

16.     This Court possesses subject matter jurisdiction over this action because this action arises, in part, under the Declaratory Relief Act, 28 U.S.C. § 2201 *et seq.*, and requests a declaration of rights arising under Federal law. Specifically, Plaintiffs seek a declaration as to their copyright ownership, rights and interests in connection with specific sound recordings pursuant to 17 U.S.C. § 501 *et seq.*, over which Federal courts have original jurisdiction. This action presents an actual case or controversy under Article III of the United States Constitution and serves the essential purpose of clarifying and settling the legal rights at issue.

17.     This Court possesses supplemental subject matter jurisdiction over the remaining claims in this action pursuant to 28 U.S.C. § 1367(a) because these claims are so related to claims in the action over which the Court has original jurisdiction that they form part of the same

case or controversy.

18.     This Court additionally possesses diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because at all pertinent times Vicky has been a citizen of Florida; the Estate has been probated in Florida; Defendants are citizens of different states (Washington and Virginia); and the matter in controversy exceeds $75,000.00, exclusive of attorneys' fees and costs.

19.     This Court possesses general jurisdiction over the Partnership, as well as Thayil, Cameron and Shepherd (collectively, the "Surviving Band Members"), as each has actively, regularly, systematically and continuously conducted business in the State of Florida and are, therefore, subject to the jurisdiction of this Court pursuant to Florida Statutes § 48.193(2).  By way of example, and without limitation, the Partnership and Surviving Band Members have: (i) granted the rights to distribute musical works in Florida in exchange for royalty payments; (ii) entered into license agreements for the exploitation of musical works, a film, and related merchandise in Florida; (iii) marketed and promoted musical works, a film and live performances in Florida; (iv) received royalties and payments generated from transactions with Florida residents; (v) offered merchandise for sale to Florida residents; and (vi) performed concert and live stage events throughout the State.

20.     Moreover, a considerable portion of the Partnership's business dealings have been regularly, systematically and continuously conducted business in the State of Florida, as Chris resided in this Court's district since 2011, and a number of the musical works for which the Partnership claims an ownership interest – including those that lie at the center of this dispute – were conceived, discussed, authored, created, produced, sent to and/or exchanged within this Court's district.

21.     Additionally, this lawsuit arises from the Partnership and Surviving Band

Members' specific activities which were directed towards Florida residents and/or caused injury within the State of Florida, such that Partnership and Surviving Band Members are each individually subject to this Court's specific jurisdiction pursuant to Florida Statutes § 48.193(1).

22.    As to Venerus, he oversees Cal Financial which, while headquartered in Charlottesville, Virginia, "provide[s] highly personalized services to clients from around the world," including the State of Florida.  Venerus and Cal Financial regularly, systematically and continuously conducted business with clients and third-parties, including Plaintiffs, in the State of Florida; have solicited business within the State of Florida; and, as described herein, conspired with the co-defendants to consciously elect to withhold amounts due to the Plaintiffs, thereby causing harm to the Plaintiffs in the State of Florida.  Venerus and Cal Financial are subject to both general and specific jurisdiction in the State of Florida.

23.    Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b)(1) and 1400(a) because the Defendants are subject to personal jurisdiction in this district and therefore "reside" in this district, within the meaning of 28 U.S.C. § 1391(c). Venue is further proper pursuant to 28 U.S.C. § 1391(b)(2) as the payments due to Plaintiffs should have been paid in this district.

24.    All conditions precedent to the prosecution of this action have been satisfied, fulfilled, extinguished, waived or otherwise executed.

### III.    FACTUAL BACKGROUND

**A.    Chris Creates the Seattle-Centric Grunge Movement**.

25.    In 1984, Chris (as vocalist and drummer) formed the Band alongside Thayil (guitar) and Hiro Yamamoto (bass).  In 1985, Scott Sundquist joined the band as a drummer to enable Chris to concentrate on his vocals and rhythm guitar.

26.    Chris quickly emerged as the Band's chief songwriter, authoring virtually all of

the compositions (including the lyrics and melodies for the band).

27.     With Chris at the helm as its front man and chief songwriter, the Band became the first grunge act to sign with legendary independent record label Sub Pop, and then earned the distinction of being the first grunge band to sign with a major label, inking a deal with A&M Records in 1989.  The Band's major label debut, *Louder Than Love*, charted on the *Billboard* 200 album chart, and the Band's videos from the album received substantial rotation on MTV.

28.     In 1991, after Shepherd replaced Hiro Yamamota as the Band's bassist, the Band recorded and released *Badmotorfinger*,[1] contemporaneously to Nirvana's *Nevermind* and Pearl Jam's *Ten*.[2]  Anchored by Chris' unique vocals and compelling songwriting, *Badmotorfinger* eclipsed the platinum sales mark and quickly rose up the *Billboard 200*.  Notably, "a lot of the album [*Badmotorfinger*] was initiated by demo tapes that Chris sent to the band." *Badmotorfinger* was nominated for a Grammy Award for Best Metal Performance in 1992; charted as one the 100 top-selling albums of the year; and is hailed as one of the greatest rock albums of all time and a genre-defining grunge album.[3]

29.     At the same time as *Badmotorfinger* was climbing the charts, Chris also recorded an album with his side project, called Temple of the Dog.  Featuring seven solo compositions by Chris (including the hit single *Hunger Strike*), and grounded in Chris' distinctive vocal stylings, the album went on to sell more than a million copies.

30.     The confluence of the success of *Badmotorfinger*, Chris' Temple of the Dog side project, and the widespread public interest in the Seattle grunge movement (as memorialized in

---

[1] Prior to Shepherd's joining of the Band, the band members equally split all writing credits in four even shares, even though Cornell was the primary author of the compositions.  This practice changed after Shepherd's arrival.

[2] "[W]hile Nirvana was the band that blew the roof off the 90s rock movement, Soundgarden were the ones that did the legwork." Greg Prato, *Soundgarden: "We Never Got Used to the Success*," Class Rock (July 20, 2005).

[3] In April 2019, *Badmotorfinger* was ranked No. # 2 on Rolling Stone's "50 Greatest Grunge Albums."

Cameron Crowe's Gen X film, *Singles*) transformed the Band into a commercial phenomenon.[4] By 1992, there were three Chris-related albums on the Billboard charts: *Badmotorfinger*, *Temple of the Dog*, and the *Singles* movie-soundtrack. Following *Badmotorfinger*, Chris led the Band on a series of immensely successful tours – first with 90s rock legends Guns N' Roses, then with Skid Row, and then at the 1992 Lollapalooza festival.

**B.    Driven By Songs Written Solely By Chris, the Album *Superunknown* Launches the Band to Massive Critical and Commercial Success.**

31.    In March of 1994, the Band released the album *Superunknown*. *Superunknown* debuted at Number #1 on the *Billboard* 200, was praised by the critics, and went on to sell more than nine million copies worldwide.[5] Notably, the two biggest singles on *Superunknown* – *Spoonman* and *Black Hole Sun* – were penned solely by Chris (as were most of the songs on the album).

32.    In 1996, following the success of *Superunknown,* the Band released the album *Down on the Upside*. Once again, the biggest singles from that album – *Burden In My Hand, Pretty Noose*, and *Blow Up The Outside World* – were written solely by Chris.

**C.    Chris' Success Transcends the Band Through His Work as a Solo Artist and With Audioslave.**

33.    In April of 1997, the Band announced that it was disbanding. However, Chris continued to realize critically-acclaimed success as both a songwriter and vocalist, both through his work as a solo artist and through his work as the lead singer of *Audioslave*.

34.    As a solo artist, Chris released three albums, including *Euphoria Morning*, which

---

[4] *Singles* featured a soundtrack containing previously unreleased cuts from the Band, Pearl Jam, The Smashing Pumpkins, Alice in Chains, plus solo recordings from Cornell under the name, Poncier.

[5] *Superunknown* has been lauded by *Rolling Stone* as one of the "Greatest Albums" of all time.

has been described an "an alt-rock masterpiece."[6] Chris also composed and performed the critically-praised theme song to the 2006 James Bond film "Casino Royale" – the first and only American male solo artist to ever be commissioned to pen a theme song for the franchise.

35.     As he had done with the Band, Chris led Audioslave to great success.  In fact, due in no small part to Chris' resonance as a vocalist and songwriter, Audioslave (which was also comprised of Tom Morello, Tim Commerford, and Brad Wilk) released numerous hit singles, including the songs *Like a Stone*, *Show Me How To Live*, and *Be Yourself.*

**D.     Soundgarden Reunites While Chris Also Continues to Pursue His Successful Solo Career**.

36.     In 2010, after a decade plus hiatus (during which Chris was the only member of the Band to maintain the level of success he had had as part of the Band), the Band regrouped and headlined the Lollapalooza festival. A month later, *Black Rain,* the band's first single since 1997 – with lyrics authored solely by Chris – was released.  That single, which was featured in the video game *Guitar Hero: Warriors of Rock*, went platinum.

37.     Over the next few years, the Band released a number of additional albums, while Chris also continued to perform as a solo act.  However, due to competing commitments, the Band did not tour again until 2017.

38.     In early 2017, the Band announced its return to the road, with a mixture of headlining gigs and previously announced festival sets.   The 2017 tour launched on April 28 in Tampa, Florida.  However, on May 17, 2017, after the Band's performance at the Fox Theatre in Detroit, Michigan, Chris was tragically found dead in his hotel room.

39.     Upon hearing the news of Chris' tragic passing, the Surviving Band Members did not see the need to turn the tour bus around, or reach out to support Vicky or console Chris'

---

[6] Corey Deiterman, *Euphoria Morning*, Chris Cornell's Unexpected Masterpiece, Houston Press (September 23, 2014).

children. Instead, they flew home, collected their money from the tour, and showed up for the very funeral to shed crocodile tears and falsely promise, "we'll always be there for the kids."

40.    In September of 2017, Cameron told *Billboard* that the Band's surviving members had not yet made a decision about the Band's future.

41.    A year later, Thayil reiterated to *Billboard* that the Surviving Band Members were still uncertain about the Band's future, as they were sensitive to honoring and preserving Chris' legacy and not cheapening the Band's brand.

**E.    The Unreleased Sound Recordings Recorded by Chris Prior to His Death.**

42.    In 2017, while at his home in Florida, Chris recorded a number of unreleased sound recordings.  At issue in this case are seven of those recordings, which were solely created by Chris on his laptop at his personal recording studio, known as TNC Studios (the "Unreleased Sound Recordings").

43.    Critically, there was never any agreement between Chris and the Band to treat the Unreleased Sound Recordings as property of the Band or the purported Partnership.  Nor was there ever any writing assigning any of Chris' interest in the Unreleased Sound Recordings to the Band, the Surviving Band Members, and/or the Partnership.  Rather, Chris was the sole and exclusive owner and copyright holder of the Unreleased Sound Recordings which he created and fixed in a tangible medium of expression.

44.    As the legal beneficiaries of Chris' copyright interests, Plaintiffs are now the sole and exclusive owners of the Unreleased Sound Recordings that Chris created in 2017.

**F.    The Surviving Band Members Inquire About the Unreleased Sound Recordings**.

45.    In July 2017, the Surviving Band Members reached out to Vicky regarding the prospect of releasing Chris' Unreleased Sound Recordings as part of a new Band album.

46.    In response, Vicky offered to voluntarily share the Unreleased Sound Recordings

with the Band, provided that Chris' vision and music legacy were preserved.  Specifically, Vicky requested that: (i) a producer that Chris trusted ("Trusted Producer") be involved in the production of the album, and (ii) she, as had historically been the case, be kept apprised of the marketing strategy for any forthcoming album.

47.    The Band initially agreed to both of these requests, and the Trusted Producer and Cameron engaged in preliminary discussions about producing the new Band album which would incorporate Chris' Unreleased Sound Recordings.  In connection with these discussions, Vicky made the recordings available to the Trusted Producer.

48.    However, approximately a year later, the Band reneged on its agreement, informing Vicky that the Band: (a) was unwilling to commit to the Trusted Producer, (b) would bring in "musicians and producers of [the Band's] choosing, and (c) was not willing to go "though any type of approval process."

49.    After the Band reneged on its agreement to preserve and respect Chris' vision and legacy, the Band's shared legal counsel, Peter Paterno, suggested that, as a compromise, the Band should pick five proposed producers, from which Vicky could choose three.  However, the Band rejected the compromise suggested by its own longtime attorney of over thirty years.

50.    Although Vicky recommended that the parties meet to further discuss a potential resolution, the Band declined, and has since refused to engage in any meaningful discussions with Vicky that might provide for the mutually-agreeable use of Chris' Unreleased Sound Recordings.

51.    In March of 2019, the Partnership and Surviving Band Members announced a July 2019 release of the Band's episode of *Live from the Artists Den*, which presented the entirety of the Band's February 2013 concert at Los Angeles' Wiltern Theater.  *Live from the Artists Den* was released on CD, LP and Blu-ray.

52.     The film version of *Live from the Artists Den* was displayed on IMAX's theatres, including at the AutoNation IMAX Theater in Fort Lauderdale in 2019.

53.     *Live from the Artists Den*, like all of the Band's other albums, are available to Florida residents for purchase, and can be streamed by Florida residents via an array of mediums, including Apple Music and Spotify.

**G.     Defendant Thayil Fabricates a Story About Chris' Unreleased Sound Recordings**.

54.     In the summer of 2019, Thayil first claimed – falsely – that the Band had requested the Unreleased Sound Recordings from Vicky but had been rebuked:

> We've asked nicely, we've suggested that this will benefit all parties, if the band could just have these files, and we could finish the songs we were working on. But there seems to be some confusion amongst various parties as to what that would entail and how that works, and who that would benefit. And it's been tiring, you know. And we can't move on until some future date when someone realizes the value of allowing the creative partners to have access to the material.[7]

Contrary to the specious reference to "songs we were working on," the Unreleased Sound Recordings are comprised of musical works that ***only*** Chris authored, recorded, or otherwise "worked on."  As to the referenced "confusion amongst various parties," Thayil was well aware that Chris singularly created the Unreleased Sound Recordings, and was likewise aware that Vicky had already offered to make the recordings available to the Band so long as they would be used pursuant to Chris' wishes and with respect for his legacy.

55.     In a November 1, 2019 interview on Sirius XM's Trunk Nation, Thayil continued to broadcast his false rhetoric, stating that it was "entirely possible" that another Soundgarden album would be released, as the Band "definitely has another record in us," and could easily finish an album based on the vocals written by Chris.  "It would be ridiculous if [the Band]

---

[7] https://consequenceofsound.net/2019/07/soundgarden-new-album-delayed-chris-cornell-demos/

didn't [release a new album]."[8]   When asked if there was an "obstacle stopping" the completion of the alleged unfinished Soundgarden album, Thayil frustratingly expressed:  "There shouldn't be … other than the fact that we don't have those files."   Thayil then added: "But, you know, these difficult things.  Partnerships and property."  The "property" to which Thayil referred is Plaintiffs' property.  The "partnership" to which Thayil referred is an entity to which Defendants fictionally claim that Chris assigned his copyright interests.   The "definite" likelihood of "another record" to which Thayil referred is anything but definite:  by the Band's own account, there are only seven recordings, not enough for a full album.

## H.   Defendants Claim They Own Chris' Unreleased Sound Recordings and Strong-arm Vicky by Withholding Money Intended for Chris' Children.

56.    On November 14, 2019, counsel for the purported Partnership sent a demand letter to Plaintiffs outrageously claiming that **all** of the Unreleased Sound Recordings, including "any recordings containing only the performances of Chris Cornell," belong exclusively to the Partnership.  (A true and correct copy of the Demand Letter is attached hereto as **Exhibit 1**).

57.    The Partnership and Surviving Band Members assert that neither Vicky nor the Estate possess any rights, interests or copyright ownership in the Unreleased Sound Recordings.  In their words, Vicky "simply has no ownership rights" in the Unreleased Sound Recordings.

58.    The Partnership has not produced any partnership documents, much less any documentation signed by Chris, supporting their conclusory claims of ownership.[9] Neither the Partnership nor the Surviving Band Members has, for example, furnished any documents evidencing that Chris transferred to the Partnership his interests in and to his copyrighted Unreleased Sound Recordings works that he authored and fixed in a tangible medium of

---

[8] *See* https://www.youtube.com/watch?v=wXY-trY1v24

[9] Throughout their collaboration, the Band was governed, not by corporate documents, but on the spirit of "unanimity."  The Band famously rejected a "majority" rule.   If one Band member did not wish to do a tour, then the Band would not tour.  This core principal governed important and mundane decisions, alike.

expression.

59.     Further, neither the Partnership nor any Surviving Band Member has – despite Chris' decorated history of working on solo projects even when he was a Band member – offered any support for their bald conclusion that any of Chris' performances contained within the Unreleased Sound Recordings were created with the intention of being used for a Soundgarden project.

60.     Likewise, there is no evidence that the Unreleased Sound Recordings, in which Chris and Chris alone authored the copyrightable elements, were ever intended to be anything but Chris' sole and exclusive property.

61.     Throughout his career, both while a member and not a member of the Band, Chris produced his own sound recordings in his home studio. Consistent with this practice, the Unreleased Sound Recordings at issue were recorded in Chris' home studio in Florida.

62.     Even during his tenure as a Band member, not all of Chris' songs were created for the Band, as Chris often simultaneously created musical works for different ventures, including solo projects.  This autonomy was not unique to Chris, as other Band members provided musical works for the Band's possible exploitation and then withdrew such musical works under claims of personal property.

63.     In sharp refutation of the bald claims presently made by the Partnership and the Surviving Band Members, Chris sent an email in March of 2013 to the Band's attorney, noting that he was supposed to receive "a partnership agreement document to review before signing" but "that document never appeared for review."  Chris further declared with crystal clarity why he would not sign any such document, as he was no longer willing to allow others to disproportionately profit from his creative labors. "Please proceed with that in mind and not the stupid communist bullshit."  The Partnership's Demand Letter assumes, wrongfully, that Chris

agreed that all of his creations should be treated as Partnership property. However, Chris' last word on the matter was a blistering repudiation, and he made a point of separating *his* works from the Band's.

64.     Plaintiffs are the beneficiaries of Cornell's copyright interests and, thus, the lawful owner of the Unreleased Sound Recordings. Coincidentally, one of the Unreleased Sound Recordings is a love ballad which Chris wrote for and sent by email to his wife, Vicky. Accordingly, Vicky not only owns that song legally as Chris Cornell's beneficiary, she is also the real-world addressee of a love letter that Chris wrote for and delivered to her.

65.     Instead of discussing or negotiating for the right to use Plaintiffs' property, the Partnership and Surviving Band Members have resorted to pressure tactics, harassment, unlawful conversion of royalties, and extortion.

66.     The Partnership and Surviving Band Members have fabricated the false narrative that Vicky is wrongfully withholding the Unreleased Sound Recordings. To add insult to injury, this false narrative callously agitates the Band's rabid fan base even though Defendants know that stalkers have already threatened the safety of Vicky and her children enough to require FBI intercession.

67.     The Partnership and Surviving Band Members have conspired with Venerus and Cal Financial Group to withhold amounts that are indisputably due and owing to the Estate. Amounts attributable to Chris' share of the artist and publishing royalties have been unlawfully withheld, without explanation or justification.

68.     The Partnership, Surviving Band Members, Venerus and Cal Financial Group are wrongfully withholding the royalty amounts owed to Plaintiffs as a means of coercion to extort property that lawfully belongs to Plaintiffs.

## COUNT I
**(Declaratory Relief – Copyright Ownership)**
**(Against the Partnership and Surviving Band Members)**

69.    Plaintiffs re-allege and reincorporate the allegations in each of the preceding paragraphs as if fully set forth herein.

70.    As a result of the Partnership and Surviving Band Members' threatened litigation, there is a real and actual controversy between Plaintiffs, on the one hand, and the Partnership and Surviving Band Members, on the other hand, as to the parties' respective ownership, rights and entitlements to the Unreleased Sound Recordings.

71.    The Unreleased Sound Recordings were created by Chris in this district, and are currently maintained in this Court's district.  Moreover, to the extent that any claim of ownership raised by the Partnership or the Surviving Band Members is premised on materials that they purportedly provided to Chris, such materials were provided to Chris in the State of Florida.

72.    The Partnership contends that all unreleased "music content," including "any recordings containing only the performances of Chris Cornell" belong exclusively to the Partnership, and that Plaintiff possess no ownership rights in and to any of the Unreleased Sound Recordings.  (*See* Ex. 1).

73.    Plaintiffs inherited any interest in and to all Cornell's copyrights pursuant to 17 U.S.C. § 201.

74.    Plaintiffs dispute that there is a Partnership.  Further, even if a Partnership existed, Chris never assigned any of his copyright interests to the purported Partnership or the Surviving Band Members.

75.    Plaintiffs are entitled to a declaratory judgment decreeing that neither the Partnership nor Surviving Band Members possess any interest in the Unreleased Sound Recordings that were solely authored by Chris.

76.     Plaintiffs are entitled to a declaratory judgment decreeing that the Partnership is not, as it claims, the sole owner of the Unreleased Sound Recordings.

77.     Moreover, in the event that any of the Unreleased Sound Recordings are deemed to be joint works of authorship. Plaintiffs are entitled to a declaratory judgment decreeing that the Estate possesses a copyright interest and an attendant right to share in the profits generated from any such joint works.

78.     Plaintiffs are entitled to an award of their attorneys' fees pursuant to 17 U.S.C. § 504.

79.     The controversy between the parties is real and substantial and demands specific relief through a decree of a conclusive character.

80.     Further, Plaintiffs have a reasonable and real apprehension that they face future litigation from the Partnership and Surviving Band Members, who have characterized the matter as "time sensitive."  (*See* Ex. 1).

## COUNT II
### (Equitable Accounting)
### (Against the Partnership and Surviving Band Members)

81.     Plaintiffs re-allege and reincorporate the allegations in each of the preceding paragraphs as if fully set forth herein.

82.     The Partnership and Surviving Band Members have refused to provide an accounting and have refused to provide Plaintiffs with the necessary records and back-up documentation and materials needed for Plaintiffs to complete an accounting relating to the amounts owed to Plaintiffs from, among other sources, their share of artist royalties, publishing royalties, and the sale of merchandise.

83.     The Partnership and Surviving Band Members assert that Vicky and the Estate are not entitled to any "access to the band's transactions, or to inspect or copy the band's books and

records." (*See* Ex. 1).

84.     However, as the lawful and beneficiary owners of Chris' share of the artist royalties, publishing royalties, and revenue generated by the sale of merchandise, Plaintiffs are minimally entitled to an equitable accounting of all profits, revenues and other financial consideration obtained by Partnership and Surviving Band Members.[10]

85.     The accounting statements should have been furnished to Plaintiffs in the State of Florida.

86.     Given the volume and complexities of the Band's dealings, as well as the fact that the essential financial records are in the exclusive control of the Partnership and Surviving Band Members, an equitable accounting is needed.  Without an equitable accounting, Plaintiffs' remedies at law are inadequate, and the Partnership and Surviving Band Members will benefit from an incomplete financial picture.

**COUNT III**
**(Conversion – Chris' Royalties)**
**(Against All Defendants)**

87.     Plaintiffs re-allege and reincorporate the allegations in each of the preceding paragraphs as if fully set forth herein.

88.     In a heavy-handed attempt to force Vicky to relinquish custody of the Unreleased Sound Recordings and to accept that neither she, her children nor the Estate possess any interest in the Unreleased Sound Recordings, the Partnership and Surviving Band Members have conspired with Venerus and Cal Financial to withhold amounts that are indisputably due and owing to the Estate.  Specifically, the Partnership and Surviving Band Members have prevailed upon Venerus and Cal Financial to withhold hundreds of thousands of dollars.

---

[10] Further, to the extent that the Partnership's stated position that Vicky is merely a "transferee' of Chris' transferrable partnership interests, she is entitled to discovery whether the Surviving Members are improperly using amounts payable to the Estate to pay Partnership's debts and liabilities.

89.     Fearful that the Partnership and Surviving Band Members would resort to ugly heavy-handed tactics and withhold money owed to Chris' minor children, Vicky wrote to Venerus and other members of Cal Financial in August of 2019:

> Just one concern – if payments are directed to [the purported Partnership] and somehow mine are held hostage by other band members refusing to allow [Venerus] to pay me then I'm not ok with that [sic] please confirm no will one will hold up my money ...

(A true and correct of the parties August 2019 email is attached hereto as **Exhibit 2**).

90.     Venerus responded: "I don't see any issue from my end with the estate being paid their [sic] share provided that each party would then be responsible for any commissions due on their share and pro-rata legal costs."   For his part, Paterno confirmed: "***The band understands Vicky must be paid***."   (*Id.*) (emphasis added).

91.     Despite the Band's admitted understanding that Vicky "must be paid," and despite the fact that amounts that belong to Plaintiffs were admittedly received in August 2019, Defendants have conspired to exercise wrongful dominion and control over Plaintiffs' property, and refuse to pay Plaintiffs.

92.     Despite demand, Plaintiffs have not received the amounts due and owing to them. When last requested, Venerus referred Vicky to the Partnership and the Surviving Band Members' attorneys, including the attorneys that sent the November 14, 2019 demand letter.

93.     Defendants' refusal to relinquish the amounts indisputably owed to Plaintiffs have caused injury to Plaintiffs in the State of Florida.

94.     Plaintiffs are entitled to restitution from Defendants of, and imposition of a constructive trust on, Plaintiffs' share of all revenues earned by the Partnership and the Surviving Band Members.

## COUNT IV
### (Conversion – Chris' Personal Property)
### (Against the Partnership and Surviving Band Members)

95.     Plaintiffs re-allege and reincorporate the allegations in each of the preceding paragraphs as if fully set forth herein.

96.     The Partnership and Surviving Band Members have exercised wrongful dominion and control over Chris' personal property, as well as his share of the Band's effects, including equipment, vintage merchandise, historical point of sale materials, promotional CDs, gold and platinum records, awards, Temple of the Dog-related items, cassette tapes, photos and related materials (collectively, "Chris' Personal Property").

97.     The Band's equipment and related items has been valued and insured in the amount in excess of six hundred thousand dollars (U.S. $600,000.00).  Plaintiffs have been charged and paying a portion of the insurance premiums. To the extent that the purported Partnership exists in the manner that the Partnership and Surviving Band Members claim, Plaintiffs are minimally entitled to Chris' share of these items.

98.     Despite Plaintiffs' demand, the Partnership and Surviving Band Members have refused to transfer or other relinquish Chris' Personal Property to Plaintiffs,

99.      The Partnership and Surviving Band Members refusal to turn over Chris' Personal Property has caused injury to Plaintiffs in the State of Florida.

100.     Plaintiffs are entitled to restitution from the Partnership and Surviving Band Members of, and imposition of a constructive trust on, Chris' Personal Property.

### COUNT V
### (Unjust Enrichment)
### (Against the Partnership and Surviving Band Members)

101.     Plaintiffs re-allege and reincorporate the allegations in each of the preceding paragraphs as if fully set forth herein.

102.    Plaintiffs conferred a benefit upon the Partnership and the Surviving Band Members, allowing them to continue to collect the full balance of amounts owed from artists royalties, publishing royalties and merchandise sales, despite the fact that a portion of these portions belong to Plaintiffs.  Plaintiffs have further conferred a benefit on the Partnership and the Surviving Band Members, permitting to them to continue to exploit Chris' name and likeness in order to generate revenue for all of the Surviving Band Members' benefit.  Plaintiffs have further conferred a benefit on the Partnership and the Surviving Band Members by paying a portion of the insurance premiums used to insure the Band's equipment.

103.    The Partnership and the Surviving Band Members knew of the benefits that have been conferred upon them, voluntarily accepted those benefits, and have consciously chosen to retain those benefits without paying Plaintiffs the respective share owed to Vicky and payable to Chris' minor children through the Estate.

104.    The Partnership and the Surviving Band Members have also improperly retained Chris' Personal Property, including but not limited to: equipment, memorabilia and personal effects, much of which remains in storage.

105.    The circumstances are such that it would be inequitable for the Partnership and the Surviving Band Members to retain the benefits conferred upon them without first paying Plaintiffs.

106.    As a proximate result of the foregoing, Defendants have unjustly received and retained benefits at the expense of Plaintiffs. Consequently, Plaintiffs are entitled to restitution from the Partnership and the Surviving Band Members of, and imposition of a constructive trust on, Plaintiffs' share of all revenues earned by the Partnership and the Surviving Band Members in exploiting works in which Plaintiffs possesses an ownership interest, as well as to all of Chris' personal property that passed to Plaintiffs through Chris' will.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter a judgment in their favor and against the Defendants:

1.     Awarding actual and compensatory damages for Defendants' respective wrongdoing in an amount to be established at trial, together with pre-judgment and post-judgment interest thereon at the maximum legal rate;

2.     Declaring that Plaintiffs are the sole and exclusive owner of the Unreleased Sound Recordings;

3.     Declaring that the Partnership is not the sole and exclusive owner of the Unreleased Sound Recordings and/or that the Plaintiffs possesses an ownership interest and entitlement to share in the profits of the Unreleased Sound Recordings as a copyright co-owner;

4.     Entering a decree granting Plaintiffs access to the Partnership's books and records, and ordering an accounting from Defendants of all revenue: (a) earned from the exploitation of the Band's musical works, including *Live from the Artists Den*; (b) received pursuant to the Band's recording agreements, publishing agreements, from digital service providers, SoundExchange, and other exploitations of the Band's musical works; and (c) generated from Soundgarden-related intellectual property, merchandise and related products, including those products made available on the official Soundgarden website;

5.     Entering a decree granting Plaintiffs access to Venerus and Cal Financial's books and records, and ordering an accounting of all revenue earned from the exploitation of the Band's musical works, including all revenue received pursuant to the Band's recording agreements, publishing agreements, from digital service providers, SoundExchange, and other exploitations of the Band's musical works, intellectual property, merchandise and related products, including those products made available on the official Soundgarden website;

6.      Ordering the Partnership to permit Plaintiffs to inspect all of the storage units in which Cornell's personal belongings are being held and/or to account to the Estate for these items;

7.      Disgorging from the Partnership and the Surviving Band Members, Plaintiffs' share of all revenue wrongfully withheld by the Defendants;

8.      Imposing a constructive trust on Plaintiffs' share of all revenue and property wrongfully withheld by Defendants;

9.      Awarding Plaintiffs their costs and reasonable attorneys' fees; and

10.     Awarding such other relief as this Court may deem just and proper.

## <u>JURY TRIAL DEMAND</u>

Plaintiffs respectfully demand a trial by jury on all claims and issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.


Dated:  December 9, 2019
            Miami, Florida

Respectfully submitted,

| | |
|---|---|
| **PRYOR CASHMAN LLP**<br>*Attorneys for Plaintiffs*<br>201 South Biscayne Boulevard, Suite 2700<br>Miami, Florida 33131<br>Telephone: (786) 582-3010<br>Facsimile:  (786) 582-3004<br><br>By: s/ *James G. Sammataro*<br>James G. Sammataro<br>Florida Bar No. 520292<br>jsammataro@pryorcashman.com | **LAVELY & SINGER PROFESSIONAL CORPORATION**<br>*Attorneys for Plaintiffs*<br>2049 Century Park East, Suite 2400<br>Los Angeles, CA  90067<br>Telephone: 310-556-3501<br>Facsimile: 310-556-3615<br><br>Martin D. Singer<br>(*pro hac vice* application forthcoming)<br>mdsinger@lavelysinger.com<br>David Jonelis, Esq.<br>(*pro hac vice* application forthcoming)<br>djonelis@lavelysinger.com |