THE HONORABLE ROBERT S. LASNIK
THE HONORABLE MICHELLE L. PETERSON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| VICKY CORNELL, individually, and in her capacity, and as the Personal Representative of the Estate of Christopher John Cornell a/k/a Chris Cornell,<br><br>    Plaintiffs,<br><br>v.<br><br>SOUNDGARDEN, a purported Washington General Partnership, KIM A. THAYIL, MATT D. CAMERON, HUNTER BENEDICT SHEPHERD, RIT VENERUS and CAL FINANCIAL GROUP, Inc.,<br><br>    Defendants.<br><br>_____<br><br>SOUNDGARDEN, a Washington General Partnership, and SOUNDGARDEN RECORDINGS LLC, a Delaware limited liability company,<br><br>    Counter-Plaintiffs,<br><br>v.<br><br>Vicky Cornell, individually, and in her capacity as the Personal Representative of the Estate of Christopher John Cornell *a/k/a* Chris Cornell,<br><br>    Counter-Defendants.. | Case No. 2:20-cv-01218−RSL−MLP<br><br>**THE SOUNDGARDEN PARTIES' MOTION FOR PRELIMINARY INJUNCTION PURSUANT TO F.R.C.P. 65**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**NOTED ON MOTION CALENDAR: April 16, 2021** |

THE SOUNDGARDEN PARTIES' MOTION
FOR PRELIMINARY INJUNCTION (No. 2:20−cv−01218−RSL-MLP) –1

1    Pursuant to Federal Rules of Civil Procedure ("FRCP") Rule 65, Defendant and Counter-

2  Plaintiff Soundgarden, a Washington General Partnership ("Soundgarden"), Defendants Kim A.

3  Thayil, Matt D. Cameron and Hunter Benedict Shepherd (the "Individual Band Defendants"), and

4  Counter-Plaintiff Soundgarden Recordings LLC (collectively the "Soundgarden Parties") bring

5  this motion for preliminary injunction ("Motion") against plaintiffs Vicky Cornell, individually

6  and in her capacity as the Personal Representative of the Estate of Christopher John Cornell

7  ("Plaintiffs").

8             I.    **STATEMENT OF SPECIFIC RELIEF SOUGHT**

9    The Soundgarden Parties seek entry of a preliminary injunction requiring that Plaintiffs,

10  during the pendency of this action and until adjudication of the relevant claims, (1) cease any

11  administration, control, or management of the Soundgarden Parties' social media accounts,

12  including, but not limited to, their Facebook, Twitter, Instagram, Vimeo, YouTube, Snapchat,

13  Tumblr, Top Spin, and Pinterest accounts, and also the Soundgarden Parties' official website at

14  https://www.soundgardenworld.com/, including the customer account with GoDaddy, which

15  registered the URL for and provides access to the official website (collectively, "Soundgarden

16  Social Media Accounts"), **and either** (2) preferably, return to the Soundgarden Parties control of

17  and password-access to the Soundgarden Social Media Accounts, **or in the alternative** (3) freeze

18  the Soundgarden Social Media Accounts with a prominent final posting in a visible location (e.g.,

19  most recent post, landing/home page, and/or "bio" section of the account) that states the

20  following: "Soundgarden has temporarily suspended its official social media accounts due to

21  pending litigation. In the interim, to follow Soundgarden, visit [link to preferred account(s)]. To

22  follow Chris Cornell, visit [link to preferred account(s)]." A proposed order is being submitted

23  concurrently for this Court's convenience.

24            II.    **INTRODUCTION**

25    Over the past decade, the use of social media has become ubiquitous. To remain culturally

26  relevant and financially competitive, businesses, entrepreneurs, and artists need to maintain active,

27  current, and thoughtfully-curated social media accounts. Social media accounts provide an

28  unparalleled medium for advertising, brand development, communication with fans, and even

THE SOUNDGARDEN PARTIES' MOTION
FOR PRELIMINARY INJUNCTION (No. 2:20−cv−01218− RSL-MLP)–2

direct sales. Consequently, businesses (including artists) pour significant funds and resources into the administration of social media accounts, often by hiring skilled professionals to develop and maintain those accounts. For artists especially, social media accounts have also effectively replaced "fan clubs" and provide important and financially-valuable data about their followers/fans. In sum. social media accounts have become invaluable capital, just like any other asset held by a business.

For more than a year, starting just before this action was filed on December 9, 2019, the Soundgarden Parties have been deprived of their ability to access, utilize, and control the official Soundgarden Social Media Accounts and their data. This is because, without any ownership right in the accounts, and having never been hired or given permission by Soundgarden to participate in their management, Plaintiffs are holding hostage the login information for the Soundgarden Social Media Accounts. Representatives of the Soundgarden Parties—the sole owners of the Soundgarden Social Media Accounts—have repeatedly requested that Plaintiffs return the login information, but Plaintiffs have refused. Plaintiffs are thus liable for conversion of the Soundgarden Parties' personal property.

Prior to the filing of this action, the Soundgarden Parties appointed their then-management company, Patriot Management ("Patriot") with the authoritative control over the Soundgarden Social Media Accounts. After Patriot was terminated in October 2019, the Soundgarden Parties learned that Patriot had wrongfully given, or otherwise allowed disclosure of, the login information for the Soundgarden Social Media Accounts to Plaintiffs (specifically to Vicky Cornell), to whom Patriot still provides management services on behalf of Mr. Cornell's Estate ("Estate"). In an email dated December 3, 2019, later produced by Patriot in this action, Patriot personnel confirmed the situation: ***"Vicky [Cornell] has since changed all the social media passwords for the band accounts and will not share them with [Patriot] as she wants the band, and I quote, 'to sue her for them'."***

While unaware of this email or its import at the time, the Soundgarden Parties eventually did "counter-sue" Plaintiffs in this action for conversion of the Soundgarden Social Media Accounts, among other related counterclaims. On these bases, there now exists a legal dispute

between the Soundgarden Parties and Plaintiffs as to who has the right to control the Soundgarden Social Media Accounts. But the Soundgarden Parties cannot wait until that dispute is adjudicated to regain control of the Soundgarden Social Media Accounts and their social media presence—or at least remove Plaintiffs' control—as their lack of control, and Plaintiffs' neglect and affirmative mismanagement, in the interim have already undermined the reputation, fan relationships, and cultural and business legacy of Soundgarden. The current untenable situation threatens irreversible damage to Soundgarden's long-term business success and to its good will and online presence established with an investment of time and money for over a decade. For these reasons, the Soundgarden Parties seek a preliminary injunction to maintain the status quo just prior to the commencement of this action, at which point Plaintiffs were not exercising control over the Soundgarden Social Media Accounts. The specific nature of the preliminary injunction sought in this Motion, including the potential alternatives, is set forth *supra* in Section I.

For the reasons detailed below, a preliminary injunction is warranted because the Soundgarden Parties (1) are likely to succeed on the merits of their claim that Plaintiffs have converted the Soundgarden Social Media Accounts by willfully taking control of these accounts without any permission or ownership right, (2) are likely to suffer irreparable harm to their reputation, fan base, and business viability if Plaintiffs are permitted to continue sabotaging the Soundgarden Social Media Accounts, (3) the issuance of a preliminary injunction will cause Plaintiffs no harm and the balance of hardships thus greatly favors the Soundgarden Parties, and (4) the requested injunctive relief is in the public interest especially to Soundgarden's fans.

### III.   FACTUAL BACKGROUND

Soundgarden, the band ("Band"), was formed in the early 1980s and evolved into a world-famous, Grammy-award-winning rock band that became a seminal influence on "grunge" rock music and the associated cultural movement originating in Seattle. The ultimate members of the Band, and partners in Soundgarden, were Mr. Cornell and the Individual Band Defendants. Mr. Cornell, the Band's lead-singer, tragically died on May 18, 2017. Plaintiff Vicky Cornell is the widow of Mr. Cornell and the personal representative of his Estate.

1    For many years, the Band's social media accounts were administered by different

2    individuals who would work at the direction of the Band with the Band's personal management,

3    most recently Patriot, acting as the intermediary for approvals and instructions. *See* Declaration of

4    Kim Thayil ("Thayil Decl.") ¶ 5. Since 2010, the Soundgarden Social Media Accounts include,

5    but are not limited to, Facebook, Twitter, Instagram, Vimeo, YouTube, Snapchat, Tumblr, Top

6    Spin, and Pinterest, and also the Band's official website at https://www.soundgardenworld.com/,

7    including the customer account with GoDaddy, which registered the URL for and provides access

8    to the Band's official website. *See* Thayil Decl. ¶ 2. Patriot's services to Soundgarden were

9    terminated in October 2019. *See* Declaration of Ray Garcia ("Garcia Decl.") ¶ 3. In early

10   December 2019, Soundgarden's counsel corresponded with Patriot requesting the delivery of the

11   log-in information and other access rights for the Soundgarden Social Media Accounts. Patriot

12   responded that the information would be gathered and delivered. *See* Garcia Decl. ¶ 4, Ex. A.

13   However, none of the log-in information or other access rights were sent and a subsequent request

14   to Patriot by Soundgarden's counsel was ignored. *See* Garcia Decl. ¶ 4. It is now clear that,

15   without authority or permission, Patriot provided, or otherwise allowed disclosure of, the log-in

16   information to Plaintiffs. This belief is confirmed, among other evidence, by an email dated

17   December 3, 2019, produced by Patriot in this action, wherein Patriot personnel stated as follows:

18   "Vicky [Cornell] has since changed all the social media passwords for the band accounts and will

19   not share them with [Patriot] as she wants the band, and I quote, 'to sue her for them'." *See* Garcia

20   Decl. Ex. A. At no point were the Surviving Band Members informed or aware that Vicky Cornell

21   had any role regarding the Soundgarden Social Media Accounts or access to passwords. *See*

22   Thayil Decl. ¶ 8. Indeed, the first time they learned that Vicky Cornell claimed some role was in

23   an email from Plaintiffs' counsel dated March 20, 2020, which stated inaccurately that "Vicky has

24   been running the social media sites for years." *See* Garcia Decl. ¶ 5, Ex. B.

25   Despite repeated requests, Plaintiffs have refused to deliver the log-in information and

26   other access rights to the Soundgarden Social Media Accounts or to otherwise relinquish their

27   control. *See* Garcia Decl. ¶ 6, Exs. 3-4. With regard to Soundgarden's official website, Plaintiffs'

28   position belies their own allegation in their original Complaint in this action (removed in

THE SOUNDGARDEN PARTIES' MOTION
FOR PRELIMINARY INJUNCTION (No. 2:20−cv−01218− RSL-MLP)–5

1    subsequent complaints) that Soundgarden "is also the owner, operator and/or licensor of the

2    Band's website, which offers official Soundgarden merchandise for sale to citizens of the State of

3    Florida. (See http://www.soundgardenworld.com/)." *See* Complaint (Dkt. No. 1) ¶10. Critically,

4    Soundgarden has continued to pay for the maintenance and administration of the official website

5    including paying The Creative Corporation, which built out the website, annual fees since 2015.

6    *See* Thayil Decl. ¶ 3.

7             Given Plaintiffs' refusals, Soundgarden has included in its Counterclaims in this action

8    three causes of action relating to the Soundgarden Social Media Accounts: (1) a count for

9    "conversion" of the Soundgarden Social Media Accounts; (2) a count for "unjust enrichment" for

10   Plaintiffs' custody and use of the Soundgarden Social Media Accounts; and (3) a count for "False

11   Designation of Origin and False Endorsement" pursuant the Lanham Act for Plaintiffs' activities

12   relating to the Soundgarden Social Media Accounts. *See* First Amended Counterclaims (Dkt. No.

13   90-1) ¶¶ 114-117, 118-121, 134-139. In responses to Soundgarden's Interrogatories in this action,

14   Plaintiffs have further and formally confirmed their refusal to return control to Soundgarden of the

15   Soundgarden Social Media Accounts, even though Vicky Cornell is not a partner in the

16   Partnership or a member of the Band. *See* Garcia Decl. Ex. C at 21-22 (Plaintiffs' Response to

17   Special Interrogatory No. 16).

18           While Vicky Cornell improperly refuses to return control of the Soundgarden Social Media

19   Accounts to Soundgarden, she has continued to control and manage these accounts to the

20   detriment of Soundgarden. *See* Garcia Decl. ¶ 7. For example, without Band permission, Vicky

21   Cornell, wrongly identifying herself as "Soundgarden," has removed fan comments and has

22   herself posted images and comments to publicly-accessible Soundgarden Social Media pages. *See*

23   Garcia Decl. Exs. J, L. Some of those postings by Vicky Cornell are clearly intended to denigrate

24   the Band and the Surviving Band Members. *See* Garcia Decl. ¶ 8, Ex. N.

25           At least some members of the public are aware that Vicky Cornell is posing as

26   "Soundgarden" and is posting the content. For example, in late-March of 2020, Vicky Cornell

27   posted as "Soundgarden" on Soundgarden's official Instagram page at

28   Instagram.com/p/BbBXofJIRO/ a photo of Cameron, Soundgarden's drummer, with the

capitalized words "FEEL THE RHYTHM WITH YOUR HANDS STEAL THE RHYTHM WHILE YOU CAN" printed over the photo. *See* Garcia Decl. ¶ 9, Ex. N. These words are lyrics taken from the 1994 Soundgarden hit recording entitled, "Spoonman." *See* Garcia Decl. ¶ 9. This posting was meant to be understood by Soundgarden fans as a comment from Vicky Cornell (masquerading as "Soundgarden" on the official Soundgarden Instagram page) about the rhythm player "stealing" from Vicky Cornell. *See* Garcia Decl. ¶ 10. Many fans got the message and they did not like it. *See id.* Examples of fan comments on the post, which have since been deleted by Vicky Cornell, include the following:

- "All time SoundgardenFan unfollowing this & CC IG account & not buying or streaming anything from the band or Chris Cornell anymore (I have my CDs & concert memories from the past & that's it)! As honestly truly sorry I am for the remaining band members…but I hate this focus on C.Cornells family and this money/rights/power crusade … those band mocking posts… the hurting comments of people… with the only effect of bruising & harming the image & the art of a real amazing BAND! Thx 2 Soundgarden for their amazing music!! RIP Chris Cornell! Kim, Ben, Matt: Keep your head up guys & stay creative!"

- "if only Matt had access to this account. Chris's widow controls it..."

- "yes its basically Vicky k mocking SG and their lawsuit"

*See id.*

   Otherwise, the Soundgarden Social Media Accounts have largely been in a state of neglect. There has been no news item added to the Band's official website since October 15, 2019 (*see* Garcia Decl. Ex. E), no new post on the Band's Twitter account since January 28, 2020 (*see* Garcia Decl. Ex. F), one new post on the Soundgarden Facebook account to promote the Chris Cornell solo album which was recently posthumously released on March 3, 2021, but none prior to that post since February 23, 2020 (*see* Garcia Decl. Ex. G), and the Band's Tumblr account has no content on it (*see* Garcia Decl., Ex. M). The Band's Facebook "Official Store" page is not operational. *See* Garcia Decl. Ex. H. The "About" page on the Band's YouTube channel contains the following: "Description: The 'Chris Cornell' Career Retrospective, featuring 'When Bad Does Good,' is available now at www.chriscornell.com." *See* Garcia Decl. Ex. I. Further, apparently due to Plaintiffs' lack of posting or other mismanagement, the Soundgarden Twitter account has been

1  stripped of its "verified blue badge" thereby casting doubt as to whether or not the account is

2  actually Soundgarden's.[1] *See* Garcia Decl. ¶ 17, Ex. F.

3        As noted, Soundgarden is informed and believes that fans of Soundgarden have become

4  aware that Vicky Cornell, and not the Soundgarden Parties, is controlling the Soundgarden Social

5  Media Accounts. This circumstance has caused direct injury to Soundgarden including

6  reputational harm and loss of income including on the basis that fans have been dissuaded from

7  purchasing merchandise on the Soundgarden official website due to doubts about the recipient of

8  associated revenue. *See* Garcia Decl. ¶ 11.

9                **IV.**    **ARGUMENT**

10      **A.**    **Standard Of Review.**

11          **1.  Purpose of Preliminary Injunction/Status Quo**

12        The purpose of a preliminary injunction is to preserve the *status quo* until the Court can

13  issue a final ruling on the underlying action's merits. *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704

14  (9th Cir.1988). The "status quo" is defined as "the last, uncontested status which preceded the

15  pending controversy." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873,

16  879 (9th Cir. 2009) (internal citations omitted).

17        Here, the Soundgarden Parties seek injunctive relief to preserve the status quo just

18  preceding the December 9, 2019, commencement of this action, and at which time the

19  Soundgarden Parties, by and through their then-management company, Patriot, controlled access

20  to and the content of the Soundgarden Social Media Accounts for the benefit of the Soundgarden

21  Parties. This status changed in early December 2019, when following the Soundgarden Parties'

22  written request to Patriot that they deliver to the Soundgarden Parties the log-in information and

23  other access rights for the Soundgarden Social Media Accounts, Patriot failed to do so. *See* Garcia

24  Decl. ¶ 4. The Soundgarden Parties now know that Patriot was unable to return the requested log-

25  in information and other access rights to the Soundgarden Parties because, after Patriot or agents

26

27

28  [1] One of the most important factors governing a social media account's success is credibility. Public figures and brands of all types strive to achieve the "verified blue badge" that Facebook and Twitter apply to accounts that serve as a seal of approval that the accounts actually belong to the person or entity that purport to maintain them.

acting at the direction of Patriot gave her access without the Soundgarden Parties' permission or authority, Vicky Cornell changed the passwords and would not share them with Patriot. *See* Garcia Decl. Ex. A. Since then, Plaintiffs (and Patriot) have ignored the Soundgarden Parties' multiple requests to deliver the log-in information so that the Soundgarden Parties may regain administrative control of the Soundgarden Social Media Accounts. *See* Garcia Decl. ¶ 6. Meanwhile, Vicky Cornell is administering the Soundgarden Social Media Accounts (without permission) and she claims the legal right to do so. Defendants contest this claim in their operative Counterclaims and are awaiting the Court's adjudication of the issue. In the meantime, a preliminary injunction is warranted to maintain the pre-litigation, pre-controversy, status quo.

### 2.   Legal Standard For Issuance Of A Preliminary Injunction.

"A party seeking a preliminary injunction must establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest." *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 877 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The Ninth Circuit evaluates these factors using a "sliding scale," on which "a stronger showing of one element may offset a weaker showing of another," such that the required showing of merit varies inversely with the showing of irreparable harm. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 992 (9th Cir. 2019) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)). In this regard, the Ninth Circuit has established that "where the 'balance of hardships. . . tips sharply towards the plaintiff,' a plaintiff need only show 'serious questions going to the merits,' rather than likelihood of success on the merits, to warrant preliminary injunctive relief." *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

As set forth in detail below, all four factors strongly favor issuance of a preliminary injunction to preserve the Soundgarden Parties' pre-litigation right to exclusively access and control the administration of the Soundgarden Social Media Accounts, or at least prevent Plaintiffs from doing so.

1

**B.**     <u>**The Soundgarden Parties Are Likely To Succeed On The Merits Of Their**</u>
<u>**Conversion Claim.**</u>

2

3    The Soundgarden Parties are likely to succeed on the causes of action in their

4    Counterclaims relating to the Soundgarden Social Media Accounts. For purposes of this Motion,

5    the Soundgarden Parties focus on their "conversion" count – namely, their claim that Plaintiffs

6    have willfully, and without legal justification, converted the Soundgarden Social Media Accounts

7    by withholding from the Soundgarden Parties the requisite passwords to access and control one of

8    Soundgarden's crucial business assets—its social media accounts.[2] Under Washington law, a

9    defendant is liable for the intentional tort of conversion where, "without lawful justification," she

10   "willfully interferes with, and thereby deprives another of, the other's right to a chattel."

11   *Davenport v. Washington Educ. Ass'n,* 147 Wash. App. 704, 721-22 (2008); *see also* Restatement

12   (Second) of Torts § 222A (1965) ("Conversion is an intentional exercise of dominion or control

13   over a chattel which so seriously interferes with the right of another to control it that the actor may

14   justly be required to pay the other the full value of the chattel."). A plaintiff claiming conversion

15   must have "a possessory or other property interest in the [converted] chattel." *Id.* (internal citations

16   omitted).

17       **1.    The Soundgarden Parties Are Likely To Establish That They Have A**
**Possessory Interest In The Soundgarden Social Media Accounts.**

18

19       Under Washington law, corporate property and assets are considered "chattel" that may be

20   converted. *Lang v. Hougan*, 136 Wash. App. 708, 718 (2007), as amended on denial of

21   reconsideration (June 19, 2007) ("'Chattel' includes both tangible and intangible goods, such as

22   corporate property.") (internal citation omitted). In addition, Washington courts "have long

23   recognized that a business's customer base, or 'goodwill,' is a commodity on which one may place

24   a monetary value." *Id.* at 719 (internal citations omitted); *see also Yagi v. Cunningham*, No.

25   56993-7-1, 2008 WL 353221, at *4 (Wash. Ct. App. Feb. 11, 2008) ("Intangible property subject

26

27   [2] Although Soundgarden has asserted multiple counterclaims against Plaintiffs, Soundgarden need only show that it is likely to succeed on one of its causes of action. *See Pratt v. Rowland*, 65 F.3d 802, 805 (9th Cir. 1995) (where preliminary injunction is warranted on one of plaintiff's claims, court need not address the merits of plaintiff's other causes of action).

28

THE SOUNDGARDEN PARTIES' MOTION
FOR PRELIMINARY INJUNCTION (No. 2:20−cv−01218− RSL-MLP)–10

1   to conversion specifically includes the goodwill value of a company.") (citing *Lang*, 136 Wash.

2   App. at 719).

3        The Soundgarden Social Media Accounts are a corporate asset that has been exclusively

4   owned by Soundgarden since each account's inception beginning in 2010. Like nearly every

5   company, artist, and brand over at least the last decade, Soundgarden has developed and relied

6   upon its social media accounts as an invaluable business asset. *See* Thayil Decl. ¶ 4. Over the

7   years, Soundgarden has consistently dedicated significant funding and resources to the

8   development of these accounts, including by paying its managers and third-party agents to

9   professionally and skillfully run the accounts in a manner designed to benefit the Band's brand

10  and popularity. *See* Thayil Decl. ¶ 5. By way of example, Soundgarden pays The Creative

11  Corporation, which built out the Soundgarden website in 2015, annual fees to maintain and

12  administer its official website. *See* Thayil Decl. ¶ 3. Soundgarden also paid individuals or entities

13  to directly maintain their social media accounts, oftentimes with Patriot or other current managers

14  acting as intermediaries. And until Patriot's termination in October 2019, a portion of the fees

15  Soundgarden paid to Patriot for management services covered Patriot's direct and indirect

16  administration of the Soundgarden Social Media Accounts. *See* Thayil Decl. ¶ 6. Through this

17  investment, the Soundgarden Social Media Accounts have become crucial business assets that

18  have facilitated the Band's ability to cultivate and sustain relationships with fans (much as "fan

19  clubs" functioned previously), attract and inform wider audiences of their activity, and generate

20  greater revenue through increased merchandise, recorded music, and concert ticket sales. *See*

21  Thayil Decl. ¶ 7.

22        While the Soundgarden Parties have hired professionals to run their social media accounts

23  (most recently as managed by Patriot), the professionals were always intermediaries that sought

24  final approval and instructions from Soundgarden, and that understood Soundgarden maintained

25  ownership rights to the accounts. *See* Thayil Decl. ¶ 5. The Soundgarden Parties have never ceded

26  ownership rights to the accounts, nor granted anyone beyond their hired professionals permission

27  to operate or post on the Soundgarden Social Media Accounts. *See* Thayil Decl. ¶ 9.

28

1

**2.  The Soundgarden Parties Are Likely To Establish That Plaintiffs Continue To Willfully Interfere With The Soundgarden Parties' Ownership Right To Access And Control The Soundgarden Social Media Accounts.**

2

3        Plaintiffs, through Vicky Cornell, are willfully interfering with the Soundgarden Parties'

4    right to control their social media accounts by refusing to provide them with the login information

5    needed to access their accounts. The Soundgarden Parties <u>first learned</u> that Vicky Cornell claimed

6    to be involved in administration of the Soundgarden Social Media Accounts upon receiving a

7    March 20, 2020 e-mail from Vicky Cornell's attorney stating that: "Vicky has been running the

8    social media sites for years." *See* Garcia Decl. Ex. A. The Soundgarden Parties never gave Vicky

9    Cornell permission to control their social media accounts, and her ability to now do so stems from

10   Patriot providing Vicky Cornell with access to these accounts whereon she changed the passwords

11   and refused to share them with Patriot. As noted, these facts are confirmed by emails produced in

12   this action which state that, as of early December 2019, "Vicky [Cornell] has since changed all the

13   social media passwords for the band accounts and will not share them with" Patriot. *See* Garcia

14   Decl. Ex. A.

15       Starting early in this action, Soundgarden repeatedly requested that Plaintiffs deliver to

16   Soundgarden its accounts' log-in information and other access rights, and otherwise relinquish

17   control over those accounts. *See* Garcia Decl. ¶ 6. Plaintiffs refused to do so, and ultimately

18   formally disputed that Soundgarden owned the accounts or the corresponding login information.

19   *See* Garcia Decl. Ex. C at 20-22 (Plaintiffs' Responses to Special Interrogatory Nos. 15-16). This

20   refusal (along with Vicky Cornell's reported statement that she wanted "the band" to "sue her for"

21   the Soundgarden Social Media Accounts), is prima facie evidence that Plaintiffs' interference is

22   willful, and that they are liable for conversion. *See* Restatement (Second) of Torts § 237 (1965)

23   ("One in possession of a chattel as bailee or otherwise who, on demand, refuses without proper

24   qualification to surrender it to another entitled to its immediate possession, is subject to liability

25   for its conversion.").

26       Not only is Vicky Cornell refusing to return this critical information to the Soundgarden

27   Parties, she is also actively posting to, removing content from, and otherwise controlling the

28   Soundgarden Social Media Accounts. Without the Soundgarden Parties' permission, Vicky

THE SOUNDGARDEN PARTIES' MOTION
FOR PRELIMINARY INJUNCTION (No. 2:20−cv−01218− RSL-MLP)–12

1  Cornell, wrongly identifying herself as "Soundgarden," has removed fan comments and has

2  herself posted images and comments to publicly-accessible Soundgarden Social Media Accounts.

3  Some of those postings by Vicky Cornell are intended to denigrate or mock the Soundgarden

4  Parties. For example, in late-March of 2020, Vicky Cornell posted as "Soundgarden" on

5  Soundgarden's official Instagram page at Instagram.com/p/B- bBXofJIRO/ a photo of Cameron,

6  Soundgarden's drummer, with the capitalized words "FEEL THE RHYTHM WITH YOUR

7  HANDS STEAL THE RHYTHM WHILE YOU CAN" printed over the photo. *See* Garcia Decl. ¶

8  9, Ex. N. These words are lyrics taken from the 1994 Soundgarden hit recording entitled,

9  "Spoonman." *See id.* Vicky Cornell's post, which she wanted Soundgarden fans to believe had

10  been posted by Soundgarden, was intended to convey that Soundgarden's rhythm player was

11  "stealing" from Vicky Cornell. *See* Garcia Decl. ¶ 10. As noted in Section III, *supra*, many fans

12  got the message and they did not like it. *See id.*

13        Other postings by Plaintiffs intentionally draw viewers away from the Soundgarden Social

14  Media Accounts or distract from Soundgarden's work. For example, on multiple occasions, Vicky

15  Cornell has used the Soundgarden Instagram to promote artists completely unrelated to

16  Soundgarden. *See* Garcia Decl. Ex. J. In large part, Vicky Cornell uses the Soundgarden Social

17  Media Accounts to promote her late husband, Mr. Cornell, and his solo artist career. From roughly

18  July 2020 to March 2021, over 80 percent of Soundgarden's social media posts referenced or were

19  about Mr. Cornell. *See id.* While Vicky Cornell uses the Soundgarden Social Media Accounts to

20  post individual tributes to Mr. Cornell or to repost content from Mr. Cornell's separate accounts,

21  there has not been a single reference to any of the Surviving Band Defendants for at least 33

22  weeks. *See id.* Vicky Cornell has included in the Soundgarden Facebook headline a promotion for

23  "The 'Chris Cornell' Career Retrospective." *See* Garcia Decl. Ex. G. She has similarly edited the

24  "bio" section of the Soundgarden Instagram so that it only says "#noonesingslikeyouanymore,"

25  which is the title of Mr. Cornell's recently posthumously released solo album and a hashtag

26  dedicated solely to Mr. Cornell. *See* Garcia Decl. Ex. L.

27        After Vicky Cornell took control of the Soundgarden Social Media Accounts, members of

28  the public took notice and began voicing frustration about Vicky Cornell's obvious take-over. *See*

THE SOUNDGARDEN PARTIES' MOTION
FOR PRELIMINARY INJUNCTION (No. 2:20−cv−01218− RSL-MLP)–13

1  Garcia Decl. Ex. J (Raine Arimitsu: "At the risk of sounding redundant, why is VK in control of

2  Soundgarden's social media?"); *id.* (Mary Lupo: "Set their page free!!!"). One Twitter user,

3  *dextweets* asked, "Who's running the SG accounts and WTF is happening w our beloved band?

4  MC has writing credits on so many songs. The band is equal parts—no one holds weight above the

5  others…which is what made them so great." *See* Garcia Decl. Ex. J. An Instagram user, *ericomonk*

6  demanded, "GIVE THIS PAGE BACK TO THE REAL OWNERS, THE BAND!" *See id.*

7  Followers of the Soundgarden Social Media Accounts became so vocally irritated with Vicky

8  Cornell's ill-focused control of the accounts that Vicky Cornell began deleting account followers'

9  comments. *See id.* (*mksmnn*: "Vicky sure is busy turning off comments."); *id.* (*pandacorn80*:

10  "Deleting comments eh? . . .This all not going quite how you anticipated?"). Disgruntled fans'

11  negative comments about Vicky Cornell became so overwhelming that she eventually deactivated

12  *all* followers' abilities to comment on Soundgarden's pages. *See id.* ("Comments on this post have

13  been limited."); *see also id.* Ex. L. This turning off the comments feature on the Soundgarden

14  Instagram account thereby making it impossible for any fan or visitor to leave any feedback to the

15  posts she chooses to make is another of Vicky Cornell's tools for controlling the narrative on

16  Soundgarden's social media accounts. The Soundgarden Instagram comments feature is currently

17  turned off. *See* Garcia Decl. Ex. L.

18        When Vicky Cornell is not using the Soundgarden Social Media Accounts to promote

19  artists other than Soundgarden or to silence Soundgarden fans, she has otherwise neglected or

20  totally abandoned the accounts. There has been no news item added to the Band's official website

21  since October 15, 2019 (*see* Garcia Decl. Ex. E), no new post on the Band's Twitter account since

22  January 28, 2020 (*see* Garcia Decl. Ex. F), no new post on the Soundgarden Facebook account

23  since February 23, 2020 (except for one post on March 3, 2021, containing the hashtag

24  "noonesingslikeyouanymore" which was promoting the recently posthumously released solo

25  album from Mr. Cornell) (*see* Garcia Decl. Ex. G), and the Band's Tumbler account has no

26  content on it (*see* Garcia Decl. Ex. M). The headline on the Band's Facebook landing page is a

27  plug for the Chris Cornell retrospective album. *See* Garcia Decl. Ex. G. The Band's Facebook

28  "Official Store" page is not operational. *See* Garcia Decl. Ex. H. The "About" page on the Band's

YouTube channel contains the following: "Description: The 'Chris Cornell' Career Retrospective, featuring 'When Bad Does Good,' is available now at www.chriscornell.com." *See* Garcia Decl. Ex. I. The Soundgarden Parties, of course, are willing and eager to cross-promote solo projects relating to Mr. Cornell on the Soundgarden Social Media Accounts, but must also be able to promote news and materials relating to Soundgarden. *See* Thayil Decl. ¶ 11.

In sum, Plaintiffs are not only withholding the Soundgarden Parties' property, but Vicky Cornell is actively using (or not using, as the case may be) that property to sabotage Soundgarden's best interests.

3.  **The Soundgarden Parties Are Likely To Establish That Plaintiffs Have No Lawful Justification For Their Interference With The Soundgarden Parties' Ownership Interest In The Soundgarden Social Media Accounts.**

Plaintiffs assert that they are justified in withholding the log-in information for the Soundgarden Social Media Accounts because Vicky Cornell allegedly "personally devoted her own time and effort in establishing, creating and maintaining" these accounts and facilitated the accounts' growth by "'drafting off' of Mr. Cornell's then-existing, separately-created popular, official accounts, which Ms. Cornell oversaw." *See* Garcia Decl. Ex. D at 5-6 (Response to Special Interrogatory No. 22). Even if true, which is far from proven, this assertion provides no legal or factual justification for Plaintiffs' interference with the Soundgarden Parties' control over their social media accounts.

As a factual matter, Vicky Cornell is not a member of the Soundgarden Partnership, so she has no ownership rights to Soundgarden business assets, including its social media accounts, in this capacity.[3] In addition, at no time did the Soundgarden Parties hire or give permission to Vicky Cornell to operate or post on their social media accounts. The Soundgarden Parties hired Patriot, for whom Vicky Cornell did not work, to provide management services, including managing Soundgarden's social media presence. *See* Garcia Decl. ¶ 3. Patriot provided these services until

---

[3] The only interest Plaintiffs have in the Soundgarden Partnership is Mr. Cornell's dissociated interest, which Ms. Cornell inherited upon her late husband's death and which is now the subject of the buyout valuation action that is the subject of a separate suit recently filed by Plaintiffs. *See Vicky Cornell v. Soundgarden et al,* Case # 2:21−cv−00192−RSL-MLP (the "Buyout Action").

THE SOUNDGARDEN PARTIES' MOTION
FOR PRELIMINARY INJUNCTION (No. 2:20−cv−01218− RSL-MLP)–15

1  they were terminated by Soundgarden in October 2019. *See id.* The Soundgarden Parties were not

2  aware that Vicky Cornell even claimed any role regarding the Soundgarden Social Media

3  Accounts until March 20, 2020, when Vicky Cornell's counsel incorrectly wrote: "Vicky has been

4  running the social media sites for years." *See* Garcia Decl. ¶ 5, Ex. 2.[4]

5       Plaintiffs' interrogatory responses indicate that Vicky Cornell's real motivation for

6  refusing to deliver Soundgarden's requested log-in information is that, once she does so, she will

7  no longer be able to control fan commentary on Soundgarden's social media accounts, which has

8  been overwhelmingly critical of Vicky Cornell. *See* Garcia Decl. Ex. C at 20 (Response to Special

9  Interrogatory No. 15) (suggesting that relinquishing control of the Soundgarden Social Media

10 Accounts would allow users to "defame Vicky Cornell" and "provoke online trolls."). The

11 Soundgarden Parties have no interest in permitting defamation of Vicky Cornell and would never

12 purposely "provoke online trolls." *See* Thayil Decl. ¶ 10.

13       **C.    If the Soundgarden Parties' Motion For Preliminary Injunction Is Denied,
           They Will Likely Suffer Irreparable Harm.**

14

15       The Soundgarden Parties will suffer irreparable harm if Plaintiffs are permitted to continue

16 controlling the Soundgarden Social Media Accounts. To establish the necessity of preliminary

17 relief, the Soundgarden Parties need only "demonstrate that irreparable injury is *likely* in the

18 absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)

19 (emphasis in original). Here, if Vicky Cornell does not stop controlling the Soundgarden Social

20 Media Accounts and if the Soundgarden Parties are denied access to those accounts, they will

21 suffer irreparable harm in the form of lost prospective audiences and sales, stunted advertising

22 efforts, and decreased fan goodwill, all of which threaten Soundgarden's business. This harm is

23 not merely speculative, as Soundgarden has already experienced reputational harm and loss of

24 income. For example, fans have been dissuaded from purchasing merchandise on the Soundgarden

25

---

26 [4] Legally, even if the Soundgarden Parties had been aware of Vicky Cornell's alleged involvement in the
   administration of the Soundgarden Social Media Accounts, or had even hired her to provide social media-related

27 services, this would not operate to transfer legal ownership of those accounts to Vicky Cornell. *See* Restatement
   (Third) of Agency § 8.05 (2006) ("An agent has a duty (1) not to use property of the principal for the agent's own
   purposes or those of a third party . . ."); *In re Est. of Haviland*, 162 Wash. App. 548, 565 (2011) ("The fiduciary duty

28 of loyalty prohibits the use of the principal's property for the benefit of the trustee") (citing Restatement); Wash. Rev.
   Code Ann. § 49.44.200(3) (employers maintain ownership of social media accounts run by employees/agents).

THE SOUNDGARDEN PARTIES' MOTION
FOR PRELIMINARY INJUNCTION (No. 2:20−cv−01218− RSL-MLP)–16

1    official website due to doubts about the recipient of the associated revenue. *See* Garcia Decl. ¶ 11.

2    In addition, Twitter recently removed Soundgarden's status as a "verified" account, i.e., an

3    "authentic presence of a notable public figure, celebrity or global brand," a status it had held since

4    at least 2014. *See* Garcia Decl. ¶ 17, Ex. F.

5         Like nearly every company, artist, and brand over at least the last decade, Soundgarden has

6    relied heavily upon its online presence to attract new fans, connect with long-time fans, sell its

7    music and merchandise, and generally promote its artistry, reputation, and global reach—all of

8    which require the ability to continuously control and update its social media accounts and respond

9    to fan commentary in real time. *See* Thayil Decl. ¶ 4. The inability to do so unquestionably harms

10   the Soundgarden Parties' reputation, marketability, fanbase, and competitive edge within the

11   music industry, as there is no viable alternative to generate the social capital and marketing that

12   social media provides. This "threat of being driven out of business," the degree of which is

13   unquantifiable in monetary terms, constitutes irreparable harm. *hiQ Labs, Inc. v. LinkedIn Corp.*,

14   938 F.3d 985, 993 (9th Cir. 2019) (internal citations omitted). Indeed, the Ninth Circuit has

15   explicitly held that "loss of . . . an ongoing business representing many years of effort and the

16   livelihood of its . . . owners, constitutes irreparable harm. What plaintiff stands to lose cannot be

17   fully compensated by subsequent monetary damages." *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d

18   985, 993 (9th Cir. 2019) (quoting *Roso–Lino Beverage Distributors, Inc. v. Coca–Cola Bottling*

19   *Co. of New York, Inc.*, 749 F.2d 124, 125–26 (2d Cir. 1984) (per curiam)). In other words,

20   "showing a threat of extinction is enough to establish irreparable harm, even when damages may

21   be available and the amount of direct financial harm is ascertainable." *hiQ Labs, Inc. v. LinkedIn*

22   *Corp.*, 938 F.3d 985, 993 (9th Cir. 2019) (internal citations omitted).

23        Even without a threat to Soundgarden's continued viability, the damage to Soundgarden's

24   reputation and visibility alone caused by the neglect or mismanagement of its social media

25   accounts constitutes irreparable harm. *See Regents of Univ. of California v. Am. Broad.*

26   *Companies, Inc.*, 747 F.2d 511, 520 (9th Cir. 1984) (district court did not abuse its discretion in

27   finding irreparable harm where plaintiff football teams presented ample evidence of "palpable

28   diminution in national reputation and following from their inability to telecast their premier

1   contests"). For example, in addressing a company's motion to enjoin a former employee from

2   posing both on and offline as the company and its affiliates, and from using the company's domain

3   name, a court in this Circuit found that, without an injunction against the employee, the company

4   would suffer irreparable injury to its "character and reputation." *Oakley, Inc. v. McWilliams*, 890

5   F. Supp. 2d 1240, 1242 (C.D. Cal. 2012). Here, too, Soundgarden's "character and reputation"

6   have suffered in light of Plaintiffs' control over their social media accounts (*see, e.g.*, Garcia Decl.

7   ¶ 11, Ex. F), and they will continue to suffer absent the requested injunction. Soundgarden's

8   ability to remain relevant and profitable depends on their fans' continued support and following,

9   which they will steadily lose without the ability to present their true character and values via their

10  official social media—the only platform reliably facilitating direct communication between artists

11  and their fans.

12        Similarly, without the ability to control its social media presence, Soundgarden may have

13  trouble attracting new fans (especially younger fans) and its advertising efforts will be hampered.

14  This "threatened loss of prospective customers or goodwill certainly supports a finding of the

15  possibility of irreparable harm." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832,

16  841 (9th Cir. 2001); *see also Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944

17  F.2d 597, 603 (9th Cir. 1991) (harm to moving party's advertising efforts and goodwill due to

18  breach of covenant not to compete qualified as irreparable); *Benda v. Grand Lodge of Int'l Ass'n*

19  *of Machinists & Aerospace Workers*, 584 F.2d 308, 315 (9th Cir. 1978) (threat that union district

20  local would lose members, and that its "financial life" was threatened, constituted "substantial and

21  irreparable" harm). Not only has Soundgarden lost fans through its inability to engage with them

22  via social media on a consistent, timely, and authentic basis, but Plaintiffs have capitalized on

23  their wrongful control of the social media accounts to direct fans *away* from Soundgarden. *See,*

24  *supra* at Section __.

25        **D.    The Balance Of Hardships Favors Granting The Soundgarden Parties'**
          **Motion.**

26

27        The irreparable, and potentially permanent, harm the Soundgarden Parties will suffer if

28  their Motion is denied greatly outweighs any potential harm Plaintiffs might suffer if control of the

1   Soundgarden Social Media Accounts is returned to the Soundgarden Parties (or, in the alternative,

2   frozen pending adjudication of relevant claims). As discussed above, denial of this Motion would

3   likely lead to a decrease in Soundgarden's fanbase and relevance and may threaten its ability to

4   remain a viable business. In contrast, Plaintiffs, like the former employee in *Oakley, Inc. v.*

5   *McWilliams* (*see supra* at Section IV.C), would suffer no hardship if forced "to refrain from

6   contacting or posing as [Soundgarden] or their associates." *Oakley, Inc.*, 890 F. Supp. At 1242.

7   Plaintiffs have no ongoing stake in Soundgarden and thus have no interest whatsoever in the

8   performance of the Soundgarden Social Media Accounts, as any financial interest Plaintiffs have

9   in Soundgarden is the subject of the Buyout Action. Recognizing this, the positions set forth in

10  Plaintiffs' interrogatory responses do not justify their interference with the Soundgarden Social

11  Media Accounts by claiming any financial or artistic stake in their administration. Rather, Vicky

12  Cornell wants to maintain control of the accounts because if she loses it, she will lose her ability to

13  stifle the unflattering comments about her that some members of the public may post online. *See*

14  Garcia Decl. Ex. C at 20 (Response to Special Interrogatory No. 15) (suggesting that relinquishing

15  control of the Soundgarden Social Media Accounts would "incite stalkers" and "provoke online

16  trolls").

17          To the extent Plaintiffs have an interest in the Soundgarden Social Media Accounts

18  because Vicky Cornell wants to ensure Soundgarden maintains a positive image of its former

19  member and her late husband, Mr. Cornell, Soundgarden shares this interest, and therefore, there

20  is no threat that Soundgarden would use its social media to denigrate Mr. Cornell. *See* Thayil

21  Decl. ¶ 12. Moreover, Mr. Cornell, as an individual artist, has his own social media accounts,

22  which Vicky Cornell manages. Vicky Cornell, as Mr. Cornell's heir, may have an ownership

23  interest in those accounts, but she has none in the Soundgarden Social Media Accounts and will

24  not suffer any hardship from not being able to control them pending resolution of relevant claims

25  in this action .

26  //

27  //

28  //

E. **The Issuance Of The Soundgarden Parties' Requested Preliminary Injunction Is In The Public Interest.**

Finally, it is in the public interest that this Court grant the Soundgarden Parties' requested injunctive relief. *Bernhardt v. Los Angeles Cty.*, 339 F.3d 920, 931–32 (9th Cir. 2003) (internal citations omitted). Now, more than ever, the public relies on social media platforms to stay informed, connect with, make purchases from, and follow its preferred brands and artists. For better or worse, social media is often the public's only source of news, connection, and culture. As such, it is important that the public can confidently assume that the social media platforms they follow are controlled by their true owners. By granting the Soundgarden Parties' requested injunctive relief, this Court can—at least until the final merits of the Soundgarden Parties' related claims are adjudicated—mitigate consumer confusion and deception, and simultaneously provide businesses the confidence to create robust and effective social media platforms without fear of losing their investment to wrongful ownership claims.

## CONCLUSION

For the foregoing reasons, the Soundgarden Parties respectfully request that this Court grant their motion for preliminary injunction.

Date:  March 25, 2021                           Respectfully submitted,


By: *s/ Paul H. Beattie*
    Paul H. Beattie, WSBA # 30277
    **Gravis Law**
    7920 SE Stellar Way
    Snoqualmie, WA  98065
    Telephone:  206.696.9095
    Email: pbeattie@gravislaw.com

    Gabriel G. Gregg
    Matthew H. Poppe
    **Rimon PC**
    800 Oak Grove Ave, Suite 250
    Menlo Park, CA  94025
    Telephone:  408.669.5354
    Email: gabriel.gregg@rimonlaw.com
    Email: Matthew.Poppe@rimonlaw.com

    *Attorneys for the Soundgarden Parties*

THE SOUNDGARDEN PARTIES' MOTION
FOR PRELIMINARY INJUNCTION (No. 2:20−cv−01218− RSL-MLP)–20

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the

3

CM/ECF system, which will send electronic notification of such filing to all CM/ECF participants.

4

5

6

Date:  March 25, 2021

7

8                                                            *s/ Gabriel G. Gregg*
                                                             Gabriel G. Gregg, Pro Hac Vice Admitted

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THE SOUNDGARDEN PARTIES' MOTION
FOR PRELIMINARY INJUNCTION (No. 2:20−cv−01218− RSL-MLP)–21